J-S01034-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1073 WDA 2022 |

Appeal from the Order Entered August 18, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000199-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: D.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1074 WDA 2022 |

Appeal from the Order Entered August 18, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000198-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: D.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1075 WDA 2022 |

Appeal from the Order Entered August 18, 2022
In the Court of Common Pleas of Allegheny County Family Court at
No(s): CP-02-AP-0000200-2021

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED: MARCH 20, 2023**

In this consolidated case, D.L. ("Mother"), appeals from the orders entered on August 18, 2022 in the Court of Common Pleas of Allegheny County Family Court that involuntarily terminated Mother's parental rights to D.L., a female born in 2010, K.L., a male born in 2017, and D.L., a male born in 2019 (collectively, the "Children").  We affirm.

On September 30, 2021, the Allegheny County Office of Children, Youth and Families ("OCYF") filed a petition seeking involuntary termination of the parental rights of Mother and the unknown fathers of each of the Children.[1] The petition alleged multiple grounds for termination pursuant to 23 Pa.C.S. §§ 2511(a)(2), (a)(5), (a)(8), and 2511(b).  A hearing on OCYF's petition was held before the trial court on July 7, 2022.  At the hearing, OCYF presented 44 joint stipulations, exhibits of the dependency orders for the Children, the OCYF's family plans, and the testimony of three OCYF caseworkers.  Mother also testified.  The trial court, in its opinion filed under Pa.R.A.P. 1925(a), compiled a thorough summary of the testimony and evidence introduced at

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother has never been married and the respective fathers of the three children are considered as unknown.  Joint stipulations were filed indicating that the putative father of the oldest of the Children was named by Mother but did not make himself available for assessment; K.L.'s putative father was established as father by an *ex parte* order of the trial court on June 2, 2021, but did not make himself available for further assessment; and the younger D.L.'s father acknowledged paternity but did not comply with requested genetic testing as of the termination of parental rights hearing. Joint Stipulations, Exhibit A, ¶¶ 6-9; Notes of Testimony at 6-17.

the hearing on OCYF's petition, which we now adopt. *See* Trial Court Opinion, 10/17/22, at 6-14.

Following the conclusion of the hearing, the trial court entered its orders terminating the parental rights of Mother and the unknown fathers to the Children. Ordersj, 8/18/22. On July 29, 2022, Mother, OCYF, and Childrens' counsel prepared and submitted proposed findings of fact and conclusions of law ordered by the trial court. Mother filed a timely notice of appeal together with a concise statement of errors complained of on appeal, and on October 17, 2022, the trial court entered its Rule 1925(a) opinion.[2]

In her brief, Mother does not challenge the trial court's determination that clear and convincing evidence existed to terminate her parental rights under 23 Pa.C.S. §§ 2511(a)(2), (a)(5), and (a)(8); rather, Mother raises the following question for our review:

> Did the trial court abuse its discretion and/or err as a matter of law in concluding that OCYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [Children] pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 7 (suggested response omitted).

We have carefully reviewed the certified record, the submissions of the parties, and the thorough and complete opinion of the trial court authored by the Honorable David L. Spurgeon, dated October 17, 2022. Based upon our review, we agree with the trial court that OCYF met its burden of establishing,

---

[2] No putative father filed an appeal in this matter.

by clear and convincing evidence, grounds for termination pursuant to 23 Pa.C.S. §§ 2511(a)(2), (a)(5), (a)(8), and 2511(b). Because we believe that the trial court has adequately and accurately examined the issue raised by Mother in this appeal, we adopt the opinion of the trial court as our own. **See** Trial Court Opinion, 10/17/22, at 1-27. As we have adopted the trial court's opinion as our own, we direct the parties to include a copy of that opinion with all future filings pertaining to the disposition of this appeal.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/20/2023

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA ORPHANS' COURT DIVISION

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | **CHILDREN'S FAST TRACK APPEAL** |
| | : | |
| D.L., | : | CP-02-AP-0000198-2021 |
|     A MINOR, | : | |
| K.L., | : | CP-02-AP-0000199-2021 |
|     A MINOR, | : | |
| D.L., | : | CP-02-AP-0000200-2021 |
|     A MINOR, | : | |
| | : | 1073 WDA 2022 |
| | : | 1074 WDA 2022 |
| | : | 1075 WDA 2022 |
| APPEAL OF: | : | |
| | : | |
| D.L., | : | **OPINION OF THE COURT** |
|     MOTHER. | : | |

**By:**

The Honorable David L. Spurgeon
Allegheny County Court of Common Pleas
440 Ross Street, Suite 506
Pittsburgh, PA 15219

**Copies to:**

Counsel for CYF,
Ilene L. Dubin, Esquire
Allegheny County Office of CYF
445 Fort Pitt Blvd.
Fort Pitt Commons, Suite 101
Pittsburgh, PA 15219

Guardian *ad litem* for Children,
Erin Krotoszynski, Esquire
KidsVoice
437 Grant Street
Suite 700
Pittsburgh, PA 15219

Counsel for D.L.. (Mother)
Jeffrey K. Eisenberg, Esquire
Allegheny County Bar Foundation
Juvenile Court Project
Koppers Building, Suite 1100
436 Seventh Avenue
Pittsburgh, PA 15219

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA ORPHANS' COURT DIVISION

| | |
|---|---|
| IN THE INTEREST OF: | **CHILDREN'S FAST TRACK APPEAL** |
| D.L., A MINOR, | CP-02-AP-0000198-2021 |
| K.L., A MINOR, | CP-02-AP-0000199-2021 |
| D.L., A MINOR, | CP-02-AP-0000200-2021 |
| | 1073 WDA 2022 |
| | 1074 WDA 2022 |
| | 1075 WDA 2022 |
| APPEAL OF: | |
| D.L., MOTHER. | **OPINION OF THE COURT** |

Spurgeon, J.                                                October 17, 2022

## OPINION

On July 7 2022, this Court issued an order terminating the parental rights of D.L. ("Mother") and unknown father ("Father") to their children D.L., a 12 year old female born May 8, 2010, K.L., a 4 year old male born November 27, 2017, and D.L., a 2 year old male born November 8, 2019. T.T. 6 at 22-23, 25; T.T.7 at 1-10.[1] The Court found that grounds existed to terminate Mother's and unknown Father's parental rights pursuant to 23

---

[1] Trial Transcript hereinafter designated at "T.T."

1

Pa. C.S. §§2511 (a) (2), (5), and (8). The Court then concluded that terminating Mother's and Father's parental rights served Children's needs and welfare pursuant to 23 Pa. C.S.§2511(b). At the conclusion of the Termination of Parental Rights (hereinafter "TPR") proceeding, the Court ordered the interested parties to draft and file proposed finding of facts, which were submitted by all interested parties on July 29, 2022. This Court entered its Order of July 7, 2022 on the docket effective August 18, 2022. Mother timely appealed the Court's Order within 30 days of this Court's order.

Mother does not assert that the Court erred when it concluded that clear and convincing evidence existed to terminate her parental rights under 23 Pa. C.S. §§2511 (a) (2), (5), and (8). Mother's only issue raised in her 1925 (b) statement is the Court erred when it ruled, pursuant to 23 Pa. C.S.§2511(b), that termination of Mother's parental rights would best serve the needs and welfare of the children. Although Mother did not raise any claim(s) of error under §§2511 (a) (2), (5), and (8), the Court views these factors as intertwined with the needs and welfare of the children analysis under §2511(b) and will address those factors in this Opinion. No putative Father appealed the Court's Order terminating parental rights.

2

## STANDARD

CYF based its petition to terminate Mother's parental rights on 23 Pa. C.S.A. §§2511 (a)(2), (a)(5), and (a)(8) and (b). These subsections provide for the involuntary termination of parental rights if the petitioner can establish any of the following grounds:

(a)(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot be remedied by the parent. [...]

(a)(5) The child has been removed from the care of the parent by the Court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. [...]

(a)(8) The child has been removed from the care of the parent by the Court or under a voluntary agreement with an agency, twelve (12) months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and the termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§2511 (a)(2), (a)(5), (a)(8).

Once the statutory grounds for involuntary termination of parental rights have been demonstrated by clear and convincing evidence, the Court must consider whether the termination would meet the needs and welfare of the child under §2511 (b):

(b) Other considerations. – The Court in terminating the rights of a parent shall give primary consideration to the development, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the Court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petitions.

23 Pa.C.S.A. §2511(b).

A party seeking termination of parental rights must establish by clear and convincing evidence that the parent's conduct satisfies at least one of the statutory grounds for termination; if it is determined that this burden of proof has been met, then the trial court must next consider the second step of the process, which entails a determination of whether termination best serves the needs and welfare if the child. *In re S.D.T., Jr.*, 934 A.2d 703 (Pa. Super. 2007). When determining whether terminating parental rights serves the child's needs and welfare, the Court must examine the nature and status of any bond between the parent and the child and consider whether severing that bond would destroy a relationship that is "necessary and beneficial." *In re P.A.B.*, 570 A.2d 522, 525 (Pa. Super. 1990). The Court is not required to use expert testimony when conducting a bonding analysis. It is permissible for the Court to accept the testimony of caseworkers and social workers in relation to the bond between the child and their natural parent and their pre-adoptive parent. The primary concern is that adequate consideration be given to the needs and welfare of the child, recognizing that a parent's own feeling of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d 1108, 1120-1121 (Pa. Super. 2010).

In reviewing an order terminating parental rights, the appellate court "is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re S.H.*, 879 A.2d 802, 809 (Pa. Super. 2005). Furthermore, the trial court is "the sole determiner of the credibility of witnesses and resolves all conflicts in testimony." *Id.*

## RELEVANT FACTS

At the July 7, 2022 TPR proceeding, the following witnesses testified:

Jaylin Hammond – CYF caseworker

Hope Cooks – A Second Chance caseworker

Sherri Ihrig – CYF adoption caseworker

Donna Lewis – Mother

Rashonda Lewis-Brookins – Mother's cousin

Pursuant to the stipulations and testimony of the July 7, 2022 TPR, the Court finds the following facts:

D.L. is Mother to D.L. ("Child 1"), a female born May 8, 2010; K.L. ("Child 2"), a male born November 27, 2017; and D.L. ("Child 3"), a male born November 8, 2019. T.T. 6 at 22-23, 25; T.T. 7 at 1-10. The Court accepted the stipulations of the parties regarding unknown Father(s): J.E.

6

was named by Mother to be the putative father of Child 1.; however, J.E. did not avail himself for assessment. Id. at 18-24. J.S. was established as the putative father of Child 2 on June 2, 2021, by an *ex parte* order of the Court of Common Pleas Family Division, Allegheny County; however, J.S. did not avail himself for assessment. Id. at 25; T.T. 8 at 1-7. M.A.B. was established as the putative father of Child 3. on June 28, 2021; however, that has not been confirmed through genetic testing. Id. at 8-22.[2]

On September 30, 2021, Allegheny County Office of Children, Youth and Families ("CYF") filed the TPR petitions seeking on behalf of Child 1, Child 2, and Child 3. T.T. 9 at 4-9. Testimony was presented that Mother had two other children that are not in her care. T.T. 10 at 5-7.

On January 3, 2020, an Emergency Custody Authorization ("ECA") was requested and granted on behalf of the subject Children. Id. at 8-12. The subject Children were placed with their maternal grandfather, E.H., where they presently remain. Id. at 13-14. The Children have been in care for thirty (30) months at the time of the proceeding. T.T. 17 at 1-3.

An ECA was requested because Mother tested positive for THC (tetrahydrocannabinol) at Child 3's birth. Id. at 17. Mother admitted to using

___

[2] Child 1, Child 2, and Child 3 are collectively referred to in this Opinion as "the subject Children" and "Children" unless reference is made to the specific Child.

7

alcohol and cocaine during the pregnancy. Id. at 18-20. Child 3 was born 34 weeks at gestation and was placed in NICU (neonatal intensive care unit) until his release on November 27, 2019.

Multiple attempts to assess and evaluate Mother's drug and alcohol usage were arranged by CYF through POWER (Pennsylvania Organization for Women in Early Recovery). T.T. 11 at 1-3. Following a Shelter Hearing on January 6, 2020, the Court found that Mother failed to complete the drug and alcohol assessments arranged by CYF. Id. at 19-25.

Dependency petitions were brought on behalf of the subject Children and a hearing was held on February 5, 2020, where the Children were adjudicated dependent. This Court ordered the following: Children to remain with their maternal grandfather, Mother was to address and successfully complete drug and alcohol treatment, obtain housing, and maintain consistent visitation with the subject Children[3]. T.T. 12 at 9-19.

The established CYF Family Plan goals in this case were for Mother to maintain sobriety, find and maintain housing, and meet the medical needs of the subject Children. T.T. 25 at 21-25; T.T. 30 at 3-8 [see also: CYF Exhibit 2].

---

[3] A Shelter Care Order dated January 6, 2020 ordered Mother to have liberal, supervised visits with the Children. Mother's visits have remained supervised throughout the life of this case. T.T. 11 at 10-11, 14-18.

8

Mother participated in the Pyramid outpatient program from January 16, 2020 to August 2020. T.T. 13 at 16-19. Mother entered inpatient drug and alcohol treatment at FamilyLinks, but did not successfully complete the program as she voluntarily withdrew herself. Id. at 21-23. Mother again participated in Pyramid from September 22, 2021. She was discharged on January 7, 2022 due to a number of "no-shows" and cancellations. T.T. 14 at 3-4. Mother has not attended any formal drug and alcohol treatment since the latest discharge from Pyramid in February 2022. Id. at 12-13.

Mother had been court ordered to undergo random drug and alcohol screens since June 4, 2020. Id. at 14-16. Mother had been screened for drugs and alcohol and tested positive for THC on October 7, 2021, and positive for cocaine on October 29, 2021. Id. at 1-9. Mother had previously tested positive for both THC and cocaine in February and July of 2020 as well as signed an acknowledgement admitting to using cocaine and THC two days prior to the July screen. T.T. 16 at 12-15, 18-21. In total, Mother attended only two of the nineteen ordered drug screens. Id. 10-17. During the TPR proceeding, Mother admitted she used cocaine six days before the TPR hearing. T.T. 189 at 2-7. Mother also admitted to smoking marijuana daily and that she did not have a valid medical marijuana license. Id. at 8-10; T.T. 36 at 21-25; T.T. 156 at 13-16.

9

Mother testified that it was her belief that the use of cocaine, alcohol and marijuana would not affect the ability to parent because "my mother did it. She raised us." T.T. 151 at 3. Mother also admitted that her mother was not always there to raise her and was "here and there when she could". T.T. 188 at 8-9. Mother admitted E.H., where her children have been placed for the last 30 months, took over her parenting because of her mother's absence in her life due to drugs and alcohol. Id.

Mother was ordered to have liberal supervised visitation with the Children. At the June 4, 2020 Permanency Review Hearing, the Court ordered Mother's supervised visits could be modified to unsupervised visits once she began to undergo drug and alcohol screens and that the screens were negative for all controlled substances and alcohol. T.T. 13 at 8-13. Despite the Court permitting a liberal visiting schedule, Mother's visits with the Children were infrequent and inconsistent. T.T. 30 at 12-15; T.T. 42 at 25; T.T. 91 at 22-23. Mother's visitation never progressed from supervised to unsupervised because of her drug usage and visitation inconsistency. T.T. 41; 11 at 17-18. Mother's failure to consistently visit Child 1 negatively impacted her feelings. T.T. 43 at 3; T.T. at 17-23.

Mother had a Court ordered goal to secure and maintain housing. At the case inception, Mother and the Children had been moving from various

addresses between the Homewood and Hill District sections of Pittsburgh, PA. T.T. 37 at 7-11. None of the residences were stable and Mother was homeless at one point. T.T. 38 at 3. Mother obtained an apartment in March, 2020, through Urban League of Pittsburgh[4]. Id. at 5. Mother admitted she did not actually reside in that residence, but instead stayed with E.H. and allowed her brothers and sisters to stay in the residence. T.T. 192 at 15-21. On September 24, 2021, eighteen (18) months after obtaining the apartment, Mother actually moved into that apartment. T.T.38 at 16.

Mother did not meet the medical needs of the children despite retaining medical decision-making rights. Children's Hospital of Pittsburgh flagged the family due to a delay in the medical care and unmet medical needs. T.T. 39 at 4-8. Child 3 had not been seen for his monthly well checks as a baby. Id. at 9-10. Upon the Children coming into care, Mother was expected to bring the Children up to date medically, including dental. Id. at 11-15. Mother was provided in-home services to assist her with scheduling Children's medical appointments. Id. at 18-20. Mother did not fulfill her obligations with the Children's medical needs, which resulted in this court appointing E.H. as secondary medical decision maker. Id. at 23-

---

[4] Mother received the housing subsidy through ARCHO. T.T. 95 at 6-9.

25. Although Mother purported that the Children received medical care; the caseworker obtained medical records from UPMC Oakland and it was revealed that the Children had not been seen at all. T.T. 119 at 20-25; T.T. 120 at 1-3. At the time of the TPR, it remained unknown when the last time Mother's participation in the Children's medical or dental care actually occurred. T.T. 41 at 5-8. Conversely after E.H.'s appointment as secondary medical decision maker, the Children were brought up to date in their medical and dental care. T.T. 57 at 12-15.

CYF presented evidence that E.H. provides the Children with a stable home and care. The Children have been in his care for thirty (30) months. T.T. 17 at 1-3. The Children are progressing positively in his care. T.T. 56 at 15-16. The Children are provided with love and attention. Id. at 17. The Children appear happy and playful in E.H.'s care. T.T. 57 at 1-3. E.H. provides the Children a safe home. Id. at 6-10.

In addition to the medical decision-making functions, E.H. was also appointed secondary educational decision maker. T.T. 15 at 16-19. This appointment resulted in part because Mother did not have an active cellphone and failed to register the children for preschool. T.T. 58 at 16-22. Currently, Child 1 is in middle school while Child 2 and Child 3 stay at home during the day with E.H. T.T. 57 at 19-25; T.T. 58 at 1. There have

12

been no truancy concerns, nor are there any special service needs required. T.T. 59 at 1-6. Child 1 performs well in school and receives grades of A's. Id. at 10-12.

E.H. has two other children that reside in the home. Id. at 13-17. There is a large support system for the children. Id. The subject Children and E.H.'s other children that reside within the home all get along well and look up to these older children. Id. at 25, T.T. 60 at 1. The home is safe, well-kept and clean. Id. at 6-7; T.T. 134 at 13-14. The Children are cared for and well-fed. Id. at 21. The Children's physical, psychological, and developmental needs are being met by E.H. T.T. 60 at 22-25.

E.H. maintains consistent contact with CYF and with Mother. Ms. Hammond testified that E.H. ensures that the Children will be permitted to have a relationship with Mother. T.T. 97 at 11-22.

There have been six permanency review hearings in this case. Mother's efforts to remedy the causes that brought her Children into care have lessened throughout the life of this case. At June 4, 2020, September 3, 2020, and December 3, 2020 hearings, Mother was found to be making moderate progress towards her goals. T.T. 14 at 17-23. At the next two hearings on June 9, 2021 and September 8, 2021, Mother was found to be in minimal compliance and making minimum progress. Id. at 24-25; T.T. 15

at 1-2. At the most recent hearing on March 3, 2022, Mother was found to not be in compliance and made no progress. Id. at 3-6.

## DISCUSSION

To terminate parental rights, a trial court must first find clear and convincing evidence that grounds for termination exist under one of the eleven subsections of 23 Pa. C.S.A. §2511(a). If grounds exist, the court must then consider, under 23 Pa. C.S.A. §2511(b), whether termination would best serve the Child's developmental, physical and emotional needs and welfare. *In re J.F.M.*, 71 A.3d 989 (Pa. Super. 2013).

In order to establish grounds to terminate under subsection (a)(2) and (a)(5), CYF must demonstrate that the conduct that led to the removal has continued to persist throughout the entire life of the case. The scope of review engaged in by the trial court spans from before removal up until the final hearing. In the instant matter, CYF has demonstrated by clear and convincing evidence that Mother is unable to parent due to her incapacity and neglect; and further, those conditions will not be remedied within a reasonable period of time due to Mother's lack of effort. Further CYF met their burden under subsection (a)(8) as they demonstrated by clear and convincing evidence that Mother failed to remedy the conduct which has resulted in the Children being out of the home for thirty (30) months.

14

In this case, Mother does not raise any claims of error with the Court's finding under subsections (a)(2), (a)(5), and (a)(8) and concedes CYF met their burden. Mother's only claim of error is limited to §2511(b), specifically that the record does not support a conclusion that termination of Mother's rights would best serve the needs and welfare of the children.

The circumstances of each case must be considered to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination of the parental rights. *In re A.L.D.*, 797 A.2d 326 (Pa. Super. 2002). The Superior Court in *In re: B, N.M.*, stated "a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In Re: B., N.M*, 856 A.2d 847, 856 (Pa. Super. 2004)

The needs and welfare analysis focuses on whether termination of parental rights meets the developmental, physical, and emotional needs of the child. *In re T.D.*, 949 A.2d 910 (Pa. Super. 2008). The analysis focuses on the totality of the circumstances. *In Interest of Coast*, 561 A.2d 762 (Pa. Super. 1989). Judicial inquiry of the needs and welfare of the child examines "the effect of parents' actions or omissions upon the child" to

15

determine whether the parent is meeting the child's developmental, physical and emotional needs. *Id.* at 767.

The Court finds in this case that Mother's continued drug use is ongoing and a significant negative impact on her ability to parent and therefore negatively affects the welfare and safety of the Children. Mother was ordered to maintain sobriety and to address her substance abuse disorder which included submission to random drug screens and treatment, find and maintain housing, visitation, and meet the medical needs of the subject Children. The Court found Mother was not compliant with these goals.

The Court accepted the testimony of CYF caseworker Jaylyn Hammond, who was assigned to this matter in August, 2021. T.T. 19 at 7. Ms. Hammond credibly testified that the family has been known to the CYF since 2014, after Mother tested positive for controlled substances during the birth of a child. T.T. 21 at 12-16. CYF attempted to assess Mother and a case was opened and subsequently closed on July 9, 2015. Id. at 22-25, T.T. 22 at 1-3. Mother was referred to CYF three more times: November 7, 2016, April 4, 2018, and November 9, 2019, due to Mother's use of marijuana and cocaine. Id. at 6-9. Mother subsequently tested positive again at Child 3's birth, resulting in a notification to CYF. T.T. 23 at 1. At

16

that time, Mother told CYF caseworkers that she smoked marijuana daily and did not plan to quit. Id. at 3-4. Mother also admitted to drinking alcohol throughout the course of the pregnancy. Id. at 5-7.

The Court was troubled by Mother's admission of her use of other, harder narcotics during the pregnancy of Child 3. Mother told CYF that she had used cocaine during the pregnancy two weekends per month. Id. at 8-10. Mother told CYF that she planned to use cocaine again when she gets money. Id. at 11-12. Further, during the TPR hearing, she admitted using cocaine six (6) days before the proceeding. T.T. 189 at 2-7.

Mother demonstrated to the Court that she was not going to stop using controlled substances nor accept the help that was provided for the addiction. Mother was not cooperative with CYF. Four attempts to assess Mother were made by CYF at her residence and caseworkers were not permitted to access the residence. Id. at 17-22. CYF made an additional POWER referral for Mother; however, Mother declined to participate and the assessment could not be completed. T.T. 24 at 13-15.

There were multiple drug addiction services offered to Mother that she did not utilize. Mother participated in intensive outpatient with Pyramid in January 16, 2020 and entered into inpatient at FamilyLinks in August 31, 2020; however, she left the facility against advice of the staff. T.T. 13 at 20-

17

23. Mother did not reengage treatment until nearly one (1) year later, September 22, 2021 only to be discharged three (3) months thereafter as "partially successful" due to the "no-shows and cancellations on a regular basis" T.T. 14 at 1-4. In that three-month period of last known treatment, Mother tested positive for THC on October 7, 2021, cocaine on October 29, 2021, and received a negative test for any substances on December 3, 2021. Id. at 5-9. Mother reentered Pyramid in February 2022 but left by May 2022. She has not engaged in any other treatment up to and including the time of the TPR proceeding. Id. at 10-13.

Mother also failed to attend her Court ordered drug screens as she attended only two (2) of nineteen (19) screening appointments. It is notable that at the two she attended, she tested positive for marijuana and cocaine. T.T. 16 at 10-15.

In it's termination analysis, the Court considered Mother's lack of concern about the negative affects drugs and alcohol have on the ability to parent and to raise a child in a safe environment. Mother testified that she didn't believe the use of drugs and alcohol affects one's ability to parent. T.T. 151 at 1-3. She reasoned that her own mother used drugs while parenting, so it was not out of the ordinary. Id. During Mother's testimony on cross-examination, she rationalized that she still cares for her Children

18

"regardless of the drugs" and that "there are people every day that does [sic] that." T.T. 189 at 19-22.

This Court finds that Mother placed her own needs above the needs of her Children. For example, CYF made numerous attempts to engage Mother to schedule family plan meetings to provide her with necessary skills to effectively parent. T.T. 26 at 21-25. Mother failed to maintain contact. T.T. 28 at 13; 58 at 17. The last family plan Mother attended was nearly two years ago on October 2, 2020. T.T. 28 at 3-5. This Court found that Mother's addiction to drugs prevented her from providing the basic parental care needed by the Children and her refusal to acquire effective parenting skills.

The Court found that Mother is unable to provide the Children with shelter. A safe, clean home is necessary for a child. Housing provides a child with safety and security. Mother demonstrated that she was unable to maintain suitable housing for the Children throughout the life of this case. The Court is unpersuaded by Mother's current living arrangement, especially in light of the fact that, left to her own devices, she will continue to use cocaine, marijuana and alcohol while the Children are present.

Mother further demonstrated her inability to provide for the welfare of her Children in terms of meeting their medical needs. Caseworker

19

Hammond testified that Mother was given an in-home worker that could assist her with keeping the Children's medical appointments. T.T. 39 at 18-20. Nonetheless, Mother failed to meet the Children's medical and dental needs. T.T. 40 at 23-24. Mother misled A Second Chance caseworker, Hope Cooks, about the Children receiving medical care; however, when Ms. Cooks obtained medical records from UPMC Oakland, it was revealed that the Children had not been seen. T.T. 119 at 20-25; T.T. 120 at 1-3. At the time of the TPR, it remained unknown when the last time Mother's participation in the Children's medical or dental care actually occurred. T.T. 41 at 5-8. The Court therefore finds that Mother lacks the parental skills to be trusted to provide appropriate medical care for the Children.

It is the opinion of the Court that given the totality of the circumstances, Mother's unwillingness to remedy her addiction issues, and the unwillingness to acknowledge the detrimental effect it has on the family, in terms of being a responsible parent who is ready and willing to provide the basic needs for the Children, the needs and welfare of the Children would be best served by Mother's rights being terminated.

The Court next turns to the bond analysis required under §2511(b). As discussed by the Superior Court [in] *In re N.A.M.*, the inquiry into whether terminating a parent's rights serves the best interest of the Child's

20

needs and welfare necessitates an inquiry into the nature and status of any

bond between the parent and child and the effect of severing that bond if it

exists:

> However, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008).
> While a parent's emotional bond with his or her child is a major aspect of subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the Court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008) The mere existence of an emotional bond does not preclude the termination of parental rights. See *In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where Court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the Orphans' Court must examine the status of the bond to determine whether its termination 'would destroy an existing, necessary and beneficial relationship.' *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011); see also, *In Re*

*K.Z.S.*, 946 A.2d 753 (Pa. Super. 2008) (discussing proper analysis of

parent/child bond in terminating parental rights).

*In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993) and its progeny have

shaped the traditional subsection (b) analysis and calls for interpretation of

any child bond.  With respect to this determination, as set forth above, this

Court conducted a parent-child bond analysis. In so doing, the Court is not

required to use expert testimony and may rely upon the evaluations of

social workers and caseworkers as well. *In re Z.P.*, 994 A.2d 1108, 1121

21

(Pa. Super. 2010). The effect of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008).

In this case, Mother never progressed from unsupervised visits. T.T. 41; 11 at 17-18. The Court made Mother aware that visits could be modified upon proof of successful completion of substance treatment and maintained sobriety. Mother was unable to comply. T.T. 13 at 8-13

Mother wasn't consistent with the visits even though this Court permitted the visitation to be liberal, meeting at the Mother's convenience. Caseworker Hammond credibly testified that Mother had not consistently attended visits, even though the visits were liberally arranged. T.T 42 at 11. The liberal visits included Mother being able to stay overnight at E.H.'s house with the Children. T.T. 91 at 18-25. Hope Cooks testified that she observed Mother at E.H.'s home during her two visits, but that was in July of 2021, before taking FMLA leave. Since her return in November 2021, Mother's visits have not been consistent. T.T. 111 at 18-25. Mother testified during the proceeding, however, the Court rejected much of her testimony in favor of the corroborated evidence offered by the CYF witnesses.

Mother's cousin Rashonda Lewis-Brookins testified about a loving relationship she observed between Mother and the Children, however, Ms.

22

Lewis-Brookins only observed these interactions when the Children were infants, and then again in July 2021. T.T. 199 at 9-11, 22-24. This court rejected much of her testimony due to the lapse of time seeing Mother and Children together and placed little weight on her opinion. The Court believes that Mother loves the Children, and a parent-child bond may exist in varying degrees for each child. The court individually analyzed the bond for each child. The Court determined that Child 2 has spent nearly all of his life in foster placement and Child 3 has spent his entire life in care. At 12 years old, Child 1 spent the most time living with Mother and may have the most significant bond although an insecure bond. *In re Adoption of T.B.B.,* 835 A.2d 387 (Pa. Super.2003). This Court relied on the testimony of Ms. Cooks about the sadness expressed by Child 1 over text messages she would receive from Mother promising to visit, but failing to adhere to her visitation promise. T.T. 113 at 10-23. Accordingly, this court finds that any bond that may exist is not beneficial, but rather detrimental. The bonding cannot be in one direction only – that of a child to the parent – but must exhibit a bilateral relationship which emanates from a parent's willingness to learn appropriate parenting . . . drug rehabilitation. . . *In re K.K.R.-S.,* 958 A.2d 529, 535 (Pa. Super. 2008). The court weighed the record regarding bond against Mother's inability to serve the needs of the Children.

23

Ultimately, the court determined that severing this bond would not cause the children to suffer extreme emotional consequences. Further, the court did not overlook in the case the harm inflicted on children by prolonged familial uncertainty. See, T.S.M., 71 A. 3d at 267-268.

While a parent's emotional bond with her Child(ren) is a major aspect of the subsection 2511 (b) best interest analysis, it is nonetheless only one of the factors to be considered by the court when determining what is in the best interest of the child. *In re Adoption of C.D.R.*, 111 A.3d 1212 (Pa. Super. 2015). Notwithstanding the bond analysis, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and the stability the Child might have with the foster parent. *Id.* at 1219.

Reunification in this case in not imminent. "A child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. *In the Adoption of R.J.S.*, 901 A.2d 502, S13 (Pa. Super. 2006). Parents have a limited time to demonstrate their fitness. In this case, Mother has 30 months to obtain sobriety, yet used cocaine less than one week before this proceeding.

Conversely, CYF presented evidence that E.H. provides the Children with a stable home and care. The Children have been in his care for thirty

24

(30) months. T.T. 17 at 1-3. The Children refer to him as Pap-Pap. T.T. 108 at 2-10. The Children are progressing positively in his care. T.T. 56 at 15-16. The Children are provided with love and attention. Id. at 17. The Children appear happy and playful in E.H.'s care. T.T. 57 at 1-3. E.H. provides the Children a safe home. Id. at 6-10.

In reaching the above conclusion the Court gave significant weight to testimony from CYF Adoption Caseworker Sherri Ihrig, who has been employed with CYF for thirty-one (31) years. T.T. 142 at 7. She has completed studies of approximately two hundred sixty-four (264) pre-adoptive families. T.T.143 at 11. Ms. Ihrig credibly testified that E.H. provides for the Children's medical needs. Since E.H.'s appointment as secondary medical decision maker, the Children have been brought up to date in their medical and dental care. T.T. 134 at 17-18. Ms. Ihrig testified that "a lot of dental work and medical care had to be done and he (E.H.) did that." Id. at 15-19.

Ms. Ihrig's observations of the family led her to opine that the family functions well together. T.T. 129. In this instance Ms. Ihrig has the unique insight and experience to make this assessment because she was also the caseworker for the other two children adopted by E.H., which have blossomed into well-functioning adults. Id. at 22-25; 130 at 1.

Ms. Ihrig credibly testified that the Children go to E.H. for their needs. T.T. 133 at 2-3. They show E.H. affection. Id. at 4. He, in turn, provides them with guidance and discipline. Id. at 5-14. It was from these observations that Ms. Ihrig concluded that E.H. was the primary functioning parent in the Children's lives. T.T. 134 at 25; T.T. 135 1-3. It was her testimony that was a significant factor on which the Court heavily relied. In reaching the conclusion that the Children's need of love, comfort, security and stability are met by E.H., who the court deemed to be the Children's primary emotional attachment. *In re K.M.*, 53 A.3d 781, 792 (Pa. Super. 2012).

In this case, the Children have been out of Mother's care for over thirty (30) months. This Court considered and finds that a strong and positive bond does exist with E.H., who provides a loving and safe environment and fertile grounds for a well-adjusted life. The Court also accepted that E.H. will continue to maintain contact with Mother and will continue to foster contact and visits between Mother and the Children. As this is a kinship placement, the Children also have access to other extended family.

Therefore, the evidence establishes and the Court concludes that termination will be able to provide Children with much needed stability and

26

permanence and that the developmental, physical, and emotional needs and welfare of the Children would be best served by terminating Mother's parental rights under 2511(b).

The record clearly demonstrated Mother's engagement in a pattern of behavior that clearly disregarded the needs and welfare of her Children.

## CONCLUSION

The evidence discussed above amply supported the Court's conclusion that Children's bond with Mother "no longer helps but rather hinder[s] the child".[5] It is clear that any bond between Mother and Children is not beneficial. It is clear that E.H.'s home provides security for the Children and that the Children are bonded to him. In totality of the circumstances, CYF has carried the burden of proving by clear and convincing evidence that Mother's rights should be terminated and would be in the Children's best interest. Therefore, for these reasons, the Court's order should be affirmed.

BY THE COURT:

_____,J.

The Hon. David L. Spurgeon

---

[5] *In re P.A.B.*, 570 A.2d 522, 526 (Pa. Super. 1990)